# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CONSTELLATION POWER       :
      SOURCE, INC.,        :
          Plaintiff        :
                         :    No. 3:04cv983 (MRK)
v.                      :
                         :
                         :
SELECT ENERGY, INC.,        :
          Defendant      :

## MEMORANDUM OF DECISION

This is a diversity action between two energy companies, Constellation Power Source, Inc., now known as Constellation Energy Commodities Group, Inc. ("Constellation"), and Select Energy, Inc. ("Select"). Each company claims the other owes it millions of dollars under a wholesale power contract they entered into in November 1999 to supply power for customers of Connecticut Light & Power ("CL&P") in Connecticut. While each side raises certain ancillary issues, this is fundamentally a dispute about contract interpretation.

The case was tried to the Court over a three-day period. The parties presented a total of nine witnesses at trial, each of whom presented their direct testimony through a written declaration submitted before trial. Those witnesses affirmed their declarations at the time of trial, and the trial itself was principally devoted to cross-examination and redirect. The testimony of certain other witnesses was presented through deposition transcripts. The parties also submitted detailed stipulations, proposed findings of fact and conclusions of law, and pretrial briefs. Following trial, the parties submitted supplemental briefs, and the Court held a lengthy oral argument. Counsel for

each side distinguished themselves throughout this case by their skillful advocacy, professionalism, and civility.  The Court is grateful to each of them.

In accordance with Rule 52 of the *Federal Rules of Civil Procedure*, the Court makes the following findings of fact and conclusions of law.

## I.

The summary that follows, which is based upon the parties' Joint Stipulation of Facts and Agreed Principles of Law [doc. # 103] Ex. A, and the facts adduced at trial, is intended to provide general background information needed to understand the parties' contractual dispute.  Further facts bearing directly on certain contested issues are also discussed in later sections.  The Court begins by providing background information about the structure and functioning of the energy market in New England, since the parties entered into the contracts at issue within that market and subject to the rules and practices governing that market.  Those rules and practices informed the parties' agreements and their dispute in this case.  Thereafter, the Court will describe the agreements at the center of this dispute, as well as the parties' implementation of those agreements.  Finally, the Court will describe the parties' claims in this action.

To give the reader some context, it suffices at this point to say that the parties' dispute centers on two contractual issues: (1) whether Select is entitled to recover from Constellation congestion charges imposed in the period before the New England energy market adopted a pricing methodology known as "Standard Market Design" (described in detail below); and (2) whether, in the period after the  adoption of Standard Market Design, Constellation is entitled to recover from Select certain charges for congestion and losses in view of the fact that CL&P reimbursed Select for some of those charges. For the uninitiated reader, the Court apologizes in advance for the

2

proliferation of acronyms and jargon, which regrettably is unavoidable in this case.

**NEPOOL and ISO New England.**   Constellation's Expert John J. Reed and Select's Expert Joseph J. Staszowski described in detail in their expert reports the operation of the New England energy market.  *See* Witness Statement of John Reed, dated Aug. 3, 2006, with attached Report, dated December 24, 2004 ("Reed Report"); Witness Statement of Joseph Staszowkski, with attached Report, dated July 29, 2005 ("Staszowski Report").[1]   The Court assumes familiarity with their reports, which will not be repeated in detail here.

The transactions at issue occurred within the wholesale power market of the New England Power Pool ("NEPOOL").  NEPOOL is a voluntary association of member entities, known as "Participants," engaged in the electric power business in the New England region, including Connecticut.  Constellation, Select, and CL&P are all Participants in NEPOOL.

On July 1, 1997, ISO New England, Inc. ("ISO New England"), a non-profit independent system operator, took over the dispatch of generation resources and management of NEPOOL's high voltage transmission lines, known as the NEPOOL "Pool Transmission Facilities" or "PTF."  The PTF is the backbone that connects the various utility distribution systems throughout the region and allows energy to move throughout New England.  In every power transaction on the NEPOOL PTF, there is both a physical dispatch (the generation and consumption of energy) and a financial settlement (who pays whom and how much for that generation and consumption of energy).  ISO New England serves as a clearing agent for the physical and financial markets to ensure that generation equals consumption and that the payments it collects equal the amounts it pays out.

---

[1] Both expert reports and witness statements are attached as Exhibits E and G to the parties' Joint Trial Memorandum [doc. # 103].

ISO New England also became responsible for implementing and enforcing the agreements, rules, tariffs, and other regulations governing NEPOOL.  On May 1, 1999, ISO New England implemented a new market-based system of prices in NEPOOL pursuant to the Restated NEPOOL Open Access Transmission Tariff (the "NEPOOL Transmission Tariff") and the NEPOOL Market Rules and Procedures (the "NEPOOL Market Rules").  In this new market-based system, ISO New England determined which generator(s) would run to meet the total requirements of consumers, while maintaining the safety and reliability of the NEPOOL PTF.  ISO New England's determination of which generators to run, or "dispatch," is generally based on the cost to the overall system (so that generators with lower bids usually get dispatched first) and is not based on bilateral contracts between Participants, including those contracts recognized and administered by ISO New England. ISO New England administers the financial settlement process according to the NEPOOL Market Rules, Pl.'s Ex. 4, and NEPOOL Transmission Tariff, Pl.'s Ex. 5.  Specifically, ISO New England maintains a "settlement account" for each Participant, which tracks the net amount owed by or to each Participant.

ISO New England groups consumers into something called  "Load Assets."  A Load Asset represents the right and obligation to provide power to a certain geographically-defined group of customers.  The owner of the Load Asset has the right and obligation to provide power to the group of customers that make up the Load Asset.  As of November 22, 1999, Section 12 of the NEPOOL Market Rules addressed various types of bilateral contracts between Participants.  Among them was a "Load Asset Contract," which was a contract pursuant to which one Participant could assign to another Participant some or all of the benefits and obligations within the ISO New England

4

settlement system for serving a Load Asset or another Load Asset Contract held by the Participant. Another form of contract was known as a Block Power Contract, under which a generator simply provides power to a customer (such as CL&P) and is not subject to the benefits and obligations associated with serving a Load Asset, as is true with a Load Asset Contract.

As of November 22, 1999, a Load Asset Contract was governed by, among other things, Appendix 12-A-9 of the NEPOOL Market Rules. *See* Joint Stip. of Facts and Law [doc. # 103] Ex. A. When Participants registered a Load Asset Contract with ISO New England, ISO New England would shift the settlement obligations listed in Appendix 12-A-9 from one Participant to the other. That is, once the Load Asset Contract form is submitted to and approved by ISO New England, the purchaser of the Load Asset becomes directly responsible to ISO New England for those financial settlement obligations which are accomplished through ISO New England's settlement system. However, ISO New England would not directly bill the purchaser of a Load Asset Contract for any congestion charges (explained in detail below) associated with that contract. Therefore, parties to a Load Asset Contract also had the right to make any other agreements between themselves, including privately shifting charges billed by ISO New England in a manner that is different from that provided by the ISO New England financial settlement system.

**Pre-SMD Rules and Practices.** During the four years in which the agreements at issue here were in effect, the electricity market in New England underwent substantial restructuring and reform. A central change that affects the issues in dispute occurred on March 1, 2003, when NEPOOL adopted significant alterations to its rules in connection with implementation of what is known as "Standard Market Design" or "SMD" (which is discussed in greater detail in the next section). The period from May 1, 1999 to March 1, 2003 is referred to in this decision as the "Pre-

SMD" period.  The period beginning March 1, 2003 and thereafter is referred to as the "Post-SMD" period.

During the Pre-SMD period, a competitive bidding process determined the price of energy placed on the NEPOOL PTF.  Specifically, all generators of power within NEPOOL would submit bids to ISO New England indicating at what price they would be willing to sell their energy for a particular hour.   In the Pre-SMD period, ISO New England set an "Energy Clearing Price" for each hour based upon the bids of generators, regardless of any transmission constraints or reliability issues.  Once set, the Energy Clearing Price was uniform across the NEPOOL PTF – that is, all locations on the PTF had the same price.

The NEPOOL PTF allows for the free flow of electric power throughout New England subject to certain constraints.  One constraint on the free flow of electric power is the physical restraints of the NEPOOL PTF.   As Mr. Reed explained it, congestion is "functionally a traffic jam on the electric transmission system that occurs between generation resources and the locations of demand."  Reed Report, at 3.  Select's expert described congestion in a similar fashion, as resulting from the inter-relationship of three factors: the amount of load in a particular location, the amount of generation in that same location and the maximum amount of power that ISO New England allowed to flow over the transmission system that serviced that location.  Staszowski Report, at 6.

 Due to congestion on the NEPOOL PTF, ISO New England sometimes had to dispatch generators that were not the lowest bidder.  "[C]ongestion increases the cost of meeting electric demands on a system by preventing the lowest–cost generator from serving that demand in transmission constrained areas."  Reed Report, at 3.  Responsibility for congestion charges is a central item of dispute between the parties in this case.

6

In the Pre-SMD period, pursuant to Section 24 of the NEPOOL Transmission Tariff, ISO New England calculated congestion costs on an hourly basis for the entire NEPOOL PTF.  The total amount of congestion costs for the month was then charged by ISO New England to entities that purchased transmission service under the NEPOOL Transmission Tariff during that hour.  As Mr. Reed explained, "the total costs of congestion were socialized and charged through transmission service on an equal per unit basis to all transmission load on the system at the time of congestion."  Reed Report at 10.

The types of transmission service available in NEPOOL were: (1) Regional Network Service, (2) Internal Point-to-Point Service, or (3) Through or Out Service.  By purchasing transmission service, the purchaser was permitted to use the NEPOOL PTF.  Furthermore, the NEPOOL Transmission Tariff provided that, in addition to the rate charged for the applicable transmission service, the entity purchasing transmission service "shall also be obligated to pay any ancillary service charges and any applicable congestion or other uplift charge required to be paid pursuant to Sections 24, 25A and 25B of this Tariff."  Joint Stip. of Facts and Law [doc. # 103] Ex. A.  At all times relevant to this dispute, CL&P procured Regional Network Service from ISO New England for all consumers in its service territory, including CL&P's entire Standard Offer Service Load and Select's entire Retail Load in CL&P's service territory.  Pre-SMD, ISO New England charged CL&P for congestion costs pursuant to Section 24 of the NEPOOL Tariff Transmission, and ISO New England did not charge any congestion costs other than those charged pursuant to Section 24.

In the Pre-SMD period, the registration of a Load Asset Contract with ISO New England did not transfer responsibility to pay congestion costs charged under the NEPOOL Transmission Tariff within ISO New England's settlement system.  In other words, the registration of a Load Asset

Contract did not alter the party to whom ISO New England invoiced congestion costs. According to Mr. Reed (and Select's witnesses did not dispute this) in the pre-SMD period, ordinarily the utility providing electric power directly to retail customers – here, CL&P – would be responsible for paying congestion charges because that entity would typically purchase transmission service and congestion charges were billed under the transmission tariff. However, parties to a bilateral contract, including a Load Asset Contract, had the right to privately allocate the ultimate responsibility between themselves for any NEPOOL or ISO New England charge, cost, product, or service, including congestion costs billed under the NEPOOL Transmission Tariff. Mr. Reed, who expressed no opinion regarding the meaning of any of the agreements in this case, acknowledged that parties could through private agreements reallocate responsibility for congestion charges, though in his experience such a reallocation was not common. *See, e.g., Alternate Power Source, Inc. v. W. Mass. Elec. Co.*, Docket Nos. EL03-9-000, -001, 101 F.E.R.C. P61,236 (Nov. 25, 2002) (holding that congestion costs assessed to a supplier may be reallocated bilaterally to a separate supplier without violating the terms of the NEPOOL Transmission Tariff or any other Federal Energy Regulatory Commission ("FERC") rule or regulation) (appended to Select's Trial Brief).

"Losses" occur whenever power is transmitted over power lines. Specifically, as power moves across power lines, a certain portion is lost due to resistance, which escapes the lines in the form of heat. Losses are the cumulative difference between the amount of energy placed on the NEPOOL PTF and the amount of energy removed (or consumed) from the NEPOOL PTF. In the Pre-SMD period, losses on the NEPOOL PTF were calculated, and pursuant to Section 20 of the NEPOOL Market Rules, ISO New England spread the cost of those losses region-wide by increasing or "grossing up" the quantity of load served by NEPOOL Participants on the basis of a system

average physical loss factor, generally about 1%.

**Post-SMD NEPOOL Rules and Practices.** While the Pre-SMD New England energy market was open and competitive, it differed from other regional competitive wholesale electricity markets. With encouragement from FERC, independent system operators such as ISO New England began to consider adopting a standard market design, which would send better price signals to market participants to achieve various policy goals of the system, including better congestion management. Finalization of the standard market design did not occur until March 2003. However, long before then and certainly at the time of the negotiations leading to the contracts at issue in this case, Select and Constellation anticipated that NEPOOL would at some point in the future adopt a different system to manage allocation of congestion costs and losses. In fact, both parties were aware that the Pennsylvania-New Jersey-Maryland power pool had adopted a location-based pricing methodology, a methodology that turned out to be broadly similar to the one NEPOOL ultimately adopted for New England.

On March 1, 2003, ISO New England implemented Market Rule 1, which was a new set of market rules and procedures based on standard market design, and which included a location-based pricing methodology. Def.'s Ex. 603. The entire set of new market rules and procedures are referred to in this opinion as "Standard Market Design" or "SMD." Under SMD, the market price for energy continues to be based on prices bid by generators, but the energy price includes more than the cost of energy. Post-SMD, the price of energy also includes components for both congestion costs and losses, which are based on specific locations, known as pricing nodes. Post-SMD, ISO New England no longer billed for congestion costs under Section 24 of the NEPOOL Transmission Tariff.

The total of the energy price and the node-specific congestion and node-specific losses is

9

known as "Locational Marginal Pricing" or "LMP."   LMP is a methodology that determines the price to serve one additional increment of load at each node on the NEPOOL PTF.  Post-SMD, each generator is compensated based on the LMP established at the node at which the generator places energy on the NEPOOL PTF.  Typically, Post-SMD, the load-serving entity is charged, and pays, the LMP.  Because pricing Post-SMD is based on location, the point where energy is delivered onto the NEPOOL PTF became important; in the Pre-SMD period, the delivery point was not so consequential because many costs, like congestion, were socialized across the New England grid regardless of location.  As Mr. Staszowski noted in his report, Post-SMD, "[t]he contract between the supplier and the buyer would likely be priced differently depending on the delivery point of the supply."  Staszowski Report at 9.  Moreover, since ISO New England calculates LMP based upon the local zone, if a contract calls for delivery at a different point, the parties to the contract must allocate between themselves the costs of delivering the energy from the delivery point to the local zone.

Because in the Post-SMD period, congestion charges are tied to location, the congestion charge component of the LMP can be either positive or negative.  Concomitant with the switch from regional to locational pricing of congestion, ISO New England also incorporated a mechanism by which NEPOOL Participants would be able to hedge against congestion costs through an auction of "Financial Transmission Rights" or "FTRs."  Periodically, ISO New England distributes the proceeds of the FTR auctions to the entities that pay congestion costs associated with supplying energy to serve load.  This is accomplished through something called "Auction Revenue Rights" or ARRs.  *See* Pl's Ex. 582.

Furthermore, Post-SMD, ISO New England no longer increases, or "grosses up" the quantity

of consumption invoiced to Load Assets to recoup losses, but instead recoups losses through the LMP.  However, in calculating the loss component of the LMP, ISO New England does not use an actual delivery point but rather a hypothetical point.  Later, if ISO New England determines that it has collected excess revenues for losses through the LMP, ISO New England redistributes the excess to the entities with the load serving obligations.

NEPOOL Market Rule 1, which implemented SMD, no longer provides for "Load Asset Contracts."  Rather, Post-SMD, a Participant desiring to shift responsibility for a Load Asset would assign, and a counter-party would accept, a "Load Asset Ownership Share."  Despite the change in terminology, the concepts are similar.  Load Asset Contracts registered with ISO New England Pre-SMD were not automatically converted into Load Asset Ownership Shares.  Instead, Participants had to re-submit each contract to ISO New England following the adoption of SMD.

**Restructuring of the New England Energy Market.**        Through 1999, CL&P was the supplier of power to every customer within its territory at prices set by the Connecticut Department of Public Utility Control ("DPUC").  However, in 1999, the power market in Connecticut was restructured so that, beginning in 2000, customers could either continue to purchase power from CL&P at standard rates ("Standard Offer Service") or purchase power from competitive retail suppliers, such as Select ("Retail Offer Service").  The DPUC authorized CL&P to obtain the power necessary to serve its Standard Offer Service load by purchasing fifty percent (50%) of its needs through a competitive bidding process and the other fifty percent (50%) from Select without soliciting competitive bids.

In August 1999, CL&P issued a request for proposals seeking bids for the competitive fifty percent (50%) of its Standard Offer Service needs.  CL&P's request for proposals included a

proposed Standard Offer Service Wholesale Sales Agreement.  At some point in the request for proposal process, it became clear that CL&P would require its suppliers to be responsible for pre-SMD congestion charges.

The bidders for the competitive fifty percent (50%) of CL&P's Standard Offer Service load included, among others, Constellation, Select, Duke Energy Trading and Marketing, L.L.C. ("Duke"), and NRG Energy Trading, Inc. ("NRG").   Thus, Constellation was aware long before November 1999 that CL&P intended its suppliers to be responsible for paying pre-SMD congestion charges.  In a cover letter to Constellation's bid, Constellation stated that "CL&P must retain the unlimited obligation to procure and maintain, at its own cost, transmission (regional and local network) and distribution for delivery from the PTF to its retail customers."  Pl.'s Ex. 57.  Constellation's bid was not successful.  Duke and NRG were the winning bidders.

Duke, NRG, and Select then each entered into separate Standard Offer Service agreements with CL&P that ran from January 1, 2000 through December 31, 2003.  Select was a "term taker" with respect to its contract to supply the non-competitive fifty percent (50%) of CL&P's Standard Offer Service – that is, Select was required to take the same terms that Duke and NRG had negotiated and the weighted average of their prices.  CL&P and Select executed their final Standard Offer Service Wholesale Sales Agreement on November 2, 1999 (the "Select/CL&P Agreement"). Pl.'s Ex. 1.

The Select/CL&P Agreement contains several provisions that are relevant to the dispute between Constellation and Select.  Two bear mention at this point.  First, the agreement made Select responsible for paying pre-SMD congestion charges.  Specifically, Section 1.4 of the Select-CL&P Agreement stated that CL&P was required to procure "Delivery Services," including Regional

Network Service transmission, but the agreement also stated that "Delivery Services shall not include losses, congestion charges, ancillary services, or any ISO charges associated with SOS Requirements Power, all of which shall be the responsibility of [Select]." Pl.'s Ex. 1, at 2. Further, Section 3.1 defined the power that Select was required to supply as including the following:

> [A]ll of the power supply and ancillary services that are or may be necessary to serve electrical load under the Restated NEPOOL Agreement during the Term, including Energy, Installed Capability, Operable Capability, Operating Reserves, Automatic Generation Control, electrical losses, *congestion charges imposed under the NEPOOL Transmission Tariff*, charges of the ISO associated with [Select's] NEPOOL membership and allocated to [Select's] provision of SOS Requirements Power for serving the Contract Load Quantity, and any other future requirements of NEPOOL and the ISO associated with the responsibility to serve load in NEPOOL.

Pl.'s Ex. 1, at 5 (emphasis added).[2]

Second, Select inserted language in the Select/CL&P Agreement to ensure that Select would not be required to provide anything to CL&P that Duke and NRG were not also required to provide CL&P under their contracts. Thus, Section 3.1 goes on to state: "The Seller shall not be required to provide any products or services . . . that are not products and services required to be provided by all other suppliers . . . under other SOS Wholesale Sales Agreements." *Id.*

**The Constellation-Select Agreements.** In October 1999, Constellation and Select began negotiating the terms of a transaction pursuant to which Constellation would sell, and Select would

---

[2]   At about the same time as the restructuring in Connecticut, the electricity market in Massachusetts was similarly restructured so that customers could either continue to purchase power from the Western Massachusetts Electric Company ("WMECO") at standard prices or could opt instead to purchase power from competitive retail suppliers. On November 1, 1999, WMECO also issued a request for proposals seeking bids for its Standard Offer Service needs. Constellation was one of the bidders for WMECO's Standard Offer Service. Constellation was selected to serve a portion of WMECO's Standard Offer Service for calendar year 2000. WMECO, like CL&P, shifted responsibility for congestion charges to those companies, like Constellation, that agreed to provide power to serve WMECO's Standard Offer Service. *See* Def.'s Ex. 525.

purchase:  (a) a portion of the power Select needed to serve fifty percent (50%) of CL&P's Standard Offer Service Load; and (b) a portion of Select's Retail Load.   To facilitate the transaction, Constellation and Select entered into a Master Power Purchase and Sale Agreement on November 22,1999 (the "Master Agreement").[3]  At the time, Constellation was fully aware of the terms of the Select/CL&P Agreement, including the fact that CL&P had shifted responsibility for pre-SMD congestion charges to Select.  *See* Def.'s Ex. 513.

The negotiation between Constellation and Select was a focus of considerable testimony at trial.  The negotiations began at a Giants football game in the early fall of 1999 when representatives of Select asked Constellation's representatives if Constellation would be interested in picking up a portion of Select's obligation to CL&P under the Select/CL&P Agreement.  Among those involved in the negotiations were Sarah Wright Meyers and Kathleen Jones of Constellation and Michael Haeflich and Frank Sabatino from Select.  Following the game, and in October and November, the parties exchanged several term sheets relating to a potential deal between Select and Constellation. Pl.'s Exs. 6-9.

The essential concept discussed by the parties and reflected in the term sheets was that Select would shift to Constellation all of the benefits and obligations of providing a portion of the load that Select had agreed to supply to CL&P, and in return Select would receive from Constellation a fixed amount per megawatt hour ("MWh") of load served by way of a discount on the power Select

---

[3]   The Master Agreement contains a provision requiring arbitration of disputes, Art. 9.2, but both parties reaffirmed at trial that they had waived their right to insist upon arbitration of this dispute.

purchased from Constellation to serve its CL&P load obligation.[4]  Originally, Select was to receive $1.00 per MWh from Constellation but that was later reduced to $.50 per MWh.  Pl.'s Ex. 5.

The term sheets themselves do not mention congestion charges.  However, the first draft of what would become the ultimate agreement between the parties, which was provided by Constellation's in-house attorney to Select's in-house attorney, does mention congestion charges. Pl.'s Exs. 10, 11.  Apparently, this was a form of agreement that Constellation had used previously. According to Constellation's witnesses, during the negotiations, Mr. Haeflich of Select asked Ms. Meyers to add certain language to the description of products and services in the draft agreement. At the time, the clause in question stated that Constellation would be responsible for "any congestion charges associated with the Load Assets and any other requirements, expenses or charges imposed by NEPOOL or ISO-NE."  Pl.'s Ex. 12.  Ms. Meyers and Ms. Brown testified that Mr. Haeflich asked them to add the words "including any NEPOOL Transmission tariffs imposed."  *Id.*  Ms. Meyers and Ms. Brown say they told Mr. Haeflich that they would not accept his proposed language because Constellation did not intend to be responsible for Pre-SMD congestion charges.  According to them, Mr. Haeflich responded that he was not sure he agreed with their interpretation of the deal and that he would check and get back to them.  He never raised the subject again.

Mr. Haeflich disputed Constellation's version of these events.  For one, he has no record of ever having transmitted such language to Ms. Meyers or Ms. Brown.  He also has no recollection of ever having discussed adding the words in question to the agreement, though he admits that it is

---

[4] For example, one iteration of the term sheet provided as follows: "Price:  For each MWh of Service that [Constellation] delivers, Select shall pay CPS a price that is equal to the greater of the price per MWh at which Select is obligated to service its initial CLP Standard Offer Load obligation, as determined by the Connecticut PUC, minus $1.00, or $44.15."  Pl.'s Ex. 7.

possible they discussed such an addition.  Mr. Haeflich is adamant, however, that at no point did

anyone from Constellation ever say or suggest that Constellation would not be responsible for Pre-

SMD congestion charges.  The other Select witnesses also testified that Mr. Haeflich never told them

that Constellation believed Select was responsible for Pre-SMD congestion charges or that anyone

from Constellation ever suggested to anyone at Select that Select would retain responsibility for Pre-

SMD congestion charges.

The Letter Agreement, which is nine pages long, contains several provisions that are central

to the parties' dispute in this case.  First, it provides that for purposes of NEPOOL, the transaction

"shall be deemed a Load Asset Contract . . . and shall transfer from Select to [Constellation]

responsibility and any corresponding benefit" of a portion of the power Select needed to serve fifty

percent (50%) of CL&P's Standard Offer Service; and (b) a portion of Select's Retail Load.  Pl.'s Ex.

3, at 2.  To that end, Select registered the Letter Agreement as a Load Asset Contract with NEPOOL

and ISO New England, and after adoption of SMD, Select registered the Letter Agreement with

NEPOOL and ISO New England as a Load Ownership Share.  *See* Def.'s Ex. 551.

Second, the Letter Agreement also contains a provision labeled "Product & ISO-NE

Settlement Obligations," which figures prominently in both sides' arguments.  That section provides

in its entirety as follows:

> [Constellation] shall sell, and Select shall purchase, at the Delivery Point sufficient
> quantities of installed capability, energy, operable capability, ten-minute spinning
> reserve, ten-minute non-spinning reserve, thirty-minute operating reserve, and
> automatic generation control to meet the settlement obligations associated with its
> percentage responsibility for the Load Assets during the Delivery Term.  This
> requirement includes changes in Standard Offer Service customer or retail customer
> demand for any reason, including but not limited to, seasonal factors, daily load
> fluctuations, increased usage, demand side management activities and extremes in
> weather.  During the Delivery Term, [Constellation], as the supplier to the Load

16

Assets, will be responsible for all requirements and associated costs for the foregoing products, losses, uplift costs and *any congestion charges associated with the Load Assets and any other requirements, expenses or charges imposed by NEPOOL or by ISO-New England, or any successor thereto ("ISO-NE"); provided however, that [Constellation] shall not be required to pay any such ISO-NE or NEPOOL charges and expenses that are not paid by Select to CL&P pursuant to the Select[/CL&P] Agreement.* Notwithstanding the foregoing, [Constellation] shall not be required to provide any products or services hereunder that are not products and services required to be provided by Select under the Select[/CL&P] Agreement.

Pl.'s Ex. 3, at 2 (emphasis added).

Third, Constellation assumed responsibility for losses via the following provision:

[Constellation] shall be responsible for its percentage share of all transmission and distribution losses associated with the delivery of electricity supplied under this Transaction to the meters of ultimate customers of CL&P receiving Standard Offer Service or Select's retail customers, as the case may be. [Constellation] shall provide Select at the Delivery Point with an additional quantity of electricity and ancillary services to cover such losses.

Fourth, the Letter Agreement contained clauses relating to "Delivery Points & Congestion Rights" and "Transmission Service" that are also relevant to this dispute:

**Delivery Point & Congestion Rights:** Any location on the NEPOOL PTF system selected by [Constellation]; provided, that [Constellation] expressly acknowledges and agrees that if CL&P or Select incurs congestion costs from the Delivery Point to the point of interconnection between CL&P's System and the NEPOOL PTF system, or the load zone or zones in CL&P System in which the load is located, then [Constellation] is responsible for such congestion costs or its pro rata share of the congestion to such zones. Select agrees to assign, transfer or pay, as applicable, to [Constellation] any and all physical and/or financial congestion rights, proceeds from the auction of such rights and any other benefits related thereto associated with each of the Load Assets for transmission of Energy, or any of the products provided by [Constellation] hereunder, received by Select or CL&P.

**Transmission Service:** [Constellation] shall be responsible for all transmission and distribution costs associated with the use of transmission systems outside of NEPOOL and any local point to point charges and distribution charges needed to deliver the power to the Delivery Point. Select shall or shall cause CL&P to, procure and maintain during the Delivery Term regional and local network transmission service and distribution service necessary to deliver the products delivered by

[Constellation] hereunder from the Delivery Point to Select's and/or CL&P's ultimate customers.

Finally, the Letter Agreement stated in the "Other Conditions" section that:

The Price is inclusive of any and all costs incurred by [Constellation] related to energy, capacity and ancillary services sold pursuant to this Transaction, including but not limited to, [Constellation's] transmission costs, fuel costs, out-of-pocket costs, emission allowance costs, and taxes; provided, however, that [Constellation] shall not be required to pay any such taxes, fees or levies that are not paid by Select pursuant to the Select[/CL&P] Agreement.

Pl.'s Ex. 3, at 8.

The parties' Letter Agreement went into effect on November 22, 1999.  Pursuant to the Select/CL&P Agreement, Select served one-half of CL&P's Standard Offer Service load for three years, from January 1, 2000, until the agreement expired on December 31, 2003.  Pl.'s Ex. 1.  Under the Master Agreement and the Letter Agreement, from January 1, 2000 through June 30, 2000, Constellation served 20% of Select's half of CL&P's Standard Offer Service, and from July 1, 2000 through December 31, 2003, Constellation served 10% of Select's half.  Pl.'s Ex.2; Pl.'s Ex. 3, at 2.

**Pre-SMD Performance**.     CL&P procured Regional Network Service from ISO New England under the NEPOOL Transmission Tariff for all of the power provided by Select and Constellation under the parties' agreement.  ISO New England invoiced CL&P for Pre-SMD congestion charges under the terms of the NEPOOL Transmission Tariff.  CL&P, in turn, invoiced Select for one-half of the congestion charges in accordance with the terms of the Select/CL&P Agreement.  *See* Pl.'s Exs. 18, 19.  Select then invoiced Constellation for 20% of these Pre-SMD congestion charges for deliveries from January 1, 2000 through June 30, 2000, and 10% of the Pre-SMD congestion charges for deliveries from July 1, 2000 through February 18, 2003.  *See, e.g.*, Def.'s Exs. 528, 530, 532, 533.

18

Constellation paid the first ten of Select's Pre-SMD congestion invoices totaling $2,180,972.45. Constellation paid the first invoice on June 21, 2000, and paid the last invoice on February 21, 2001. On or about June 25, 2001, Constellation sent Select a letter disputing Constellation's liability for Pre-SMD congestion costs under the Letter Agreement and requesting reimbursement for the amounts it had previously paid. Constellation claims in this action that it paid these first 10 invoices by mistake, an issue that the Court will discuss further below. Select did not refund the money requested and instead issued Constellation another thirty-two invoices for Pre-SMD congestion costs, totaling $2,381,534.61, exclusive of interest. Constellation did not pay any of those thirty-two invoices, and responsibility for Pre-SMD congestion charges is one of two key issues that this Court must resolve in this case.[5]

**Post-SMD Performance.** During the Post-SMD period, ISO New England invoiced Constellation for the LMP (at the Connecticut zone) attributable to its share of CL&P's Standard Offer Service under the terms of the Letter Agreement.[6] The price of energy charged to Constellation during this period was determined by the LMP of the Connecticut load zone. During the Post-SMD period, ISO New England distributed $243,725.05 in ARRs to Constellation as a result of it supplying a portion of the CL&P load under the Letter Agreement. *See* Def.'s Ex. 582.

---

[5] Constellation issued invoices to Select for the power that Select purchased from pursuant to the Letter Agreement. Select paid Constellation all of these invoices in full and did not seek to set-off the disputed congestion charges against the amounts it owed Constellation for power.

[6] In the Post-SMD period, ISO New England no longer grossed up the quantity of energy charged as a way of recouping losses. Instead, ISO New England included marginal losses in the LMP. Despite this change, Constellation continued in the Post-SMD period to gross up the load billed to Select by 1%. As a result, Select paid Constellation $401,037.94 as a result of the grossing up of load by Constellation in the Post-SMD period.

Before SMD went into effect on March 1, 2003, Select and CL&P discussed billing and contract administration under the Select/CL&P Agreement, *see* Pl.'s Ex. 28, and they confirmed their understandings about those issues in a letter dated February 21, 2003 (the "Select/CL&P Letter Agreement"), which explicitly stated that it did not modify any of the terms of the Select/CL&P Agreement.  Pl.'s Ex. 26.

The letter recites that under section 1.3 of the Select/CL&P Agreement, Select had the right to choose any point on the NEPOOL PTF as a delivery point, at which point "title to and liability for such power passes from [Select] to [CL&P]" and that CL&P understood that Post-SMD, Select might choose delivery points outside of the Connecticut load zone.  In order to facilitate billing and contract administration, CL&P and Select agreed that Post-SMD, Select would accept load assets in the Connecticut zone equal to the amount of load Select was responsible for supplying under the Select/CL&P Agreement.  In return for this accommodation, CL&P agreed to pay Select an "LMP Differential Amount," which was simply the difference between the real-time LMP at the Connecticut load zone and the real-time LMP at each delivery point designated by Select.  Select was required to provide advanced written notice of delivery points, and Select was further limited in the number of delivery points it could choose.  *See* Pl.'s Ex. 26.  Select was to bill CL&P monthly for the LMP Differential Amount.

Select never informed Constellation of the Select/CL&P Letter Agreement.  In fact, in June 2003, approximately four months after entering into the Select/CL&P Letter Agreement, Select informed Constellation that "Select does not have any documents that modify or change the Select[/CL&P] Agreement."  Pl.'s Ex. 32.

Following execution of the Select/CL&P Letter Agreement, CL&P filed an action with the

DPUC to allow CL&P to recover from its customers the increased costs associated with the LMP Differential Amount.  The DPUC authorized CL&P to recover the LMP Differential Amount from its customers for sixty days and directed CL&P to file a petition for a declaratory order with the FERC.  CL&P filed this petition on  May 27, 2003, requesting FERC to order Select and other suppliers to bear SMD-related congestion costs and losses charges incurred in transmitting to its retail purchasers the energy CL&P purchased from suppliers.  The petition bore Docket No. EL03-129-000 (the "FERC Proceeding").  *See* Def.'s Ex. 609.  Thereafter, the DPUC allowed CL&P to continue to collect the LMP Differential Amount from its customers while the FERC Proceeding was pending and ordered that the monies be held in escrow pending resolution of the FERC Proceeding.

Select, Duke, and NRG intervened in the FERC Proceeding and each argued that under the terms of their agreements with CL&P, CL&P alone was responsible for paying the LMP, and accordingly, CL&P was required to reimburse them for the LMP Differential Amount.  *See, e.g.*, Pl.'s Ex. 48, at 32 (The Select/CL&P Agreement "clearly assign[s] to CL&P all charges associated with transmitting SOS Requirements Power from the Delivery Point to CL&P's retail load.  As a result, CL&P is responsible for the charges imposed by SMD for such transmission.  To hold otherwise would run counter to the clear language of the [Select/CL&P Agreement] . . . .").  The total LMP Differential sought by Select, Duke, and NRG was $185,871,471.  Select's share of that sum was $97,179,698.61, of which $30,653,392.12 was attributable to congestion and $66,526,280.84 was attributable to losses.  Pl.'s Ex. 45.  The $97 million of LMP Differential Amount sought by Select included LMP amounts that Constellation had paid to ISO New England for the portion of CL&P's Standard Offer Service that Constellation was providing under the Letter Agreement.  Pl.'s Ex. 45.

In effect, 10% of the amounts sought by Select in the FERC Proceeding was attributable to the portion of CL&P's energy supplied by Constellation. Yet Select never informed Constellation of the FERC Proceeding, or that in that proceeding, Select was seeking a refund from CL&P of amounts that included LMP payments that Constellation had made under the Letter Agreement. At some point during the pendency of the FERC Proceeding, Constellation learned of the proceeding and that Select was taking the position that it was not responsible for paying LMP under its agreement with CL&P. Because Constellation believed that, under the Letter Agreement, it was not responsible to pay any charge that Select was not responsible for under the Select/CL&P Agreement, Constellation, in September 2003, demanded reimbursement from Select of the difference between the LMP at the Connecticut load zone that ISO New England was charging to Constellation and the LMP at delivery points designated by Constellation (the "Constellation LMP Differential Amount"), in the total amount of $5,100,105.07 for March 2003 through July 2003.  Pl.'s Exs. 34-35, 37.

On September 22, 2003, Select wrote to Constellation and contested the claim that Select owed Constellation any LMP Differential Amount:

> Select does not agree that it owes Constellation the invoiced costs of congestion and losses, which Constellation asserts are based on the CL&P Letter Agreement. Moreover, as Constellation is aware, the CL&P Letter Agreement, which simply provides for administration of Select's contract with CL&P, is currently the subject of litigation at FERC. Accordingly, your claim that Select is responsible to Constellation for congestion and losses based on the CL&P Letter Agreement is, at a minimum, premature.

Pl.'s Ex. 36.  On October 7, 2003, Constellation sent a second letter to Select demanding reimbursement of the LMP.   Select responded on October 10, 2003.  Even though Select now criticizes Constellation for not intervening in the FERC Proceeding, Frank Sabatino of Select wrote to Constellation in the October 10 letter with the following suggestion regarding the parties' dispute:

> Our suggestion at this time would be to wait until the ongoing litigation before FERC resolves the current disagreement between CL&P and its suppliers and to revisit any concerns you may have based on the outcome of that litigation.  It you are concerned about the running of any dispute periods between now and then, we would waive any right we have to object to the timeliness of any challenge by [Constellation] that it delays making hereafter until a FERC decision resolves the disputes at the FERC.

Pl.'s Ex. 38.   Constellation did not attempt to intervene in the FERC proceeding.

On or before October 15, 2003, Constellation sent an invoice to Select for August 2003, in the amount of $1,662,777.67.  On or about October 15, 2003, Constellation invoiced Select for $796,104.41 for a Constellation LMP Differential Amount for the month of September 2003.[7]  On or about December 21, 2003, Constellation invoiced Select for $927,416.27 and $742,046.33 for a Constellation LMP Differential Amount for the months of October and November 2003, respectively.  On or about January 21, 2004, Constellation invoiced Select for $1,202,756.83 for a Constellation LMP Differential Amount for the month of December 2003.  Constellation has conceded that some of the delivery points selected for purposes of these invoices were not even on the NEPOOL PTF, contrary to the terms of the Letter Agreement.  Select has not paid Constellation for any of these Constellation LMP Differential Amount invoices, which total $10,431,206.58.

CL&P and other intervenors, including the Connecticut Attorney General and the Connecticut Office of Consumer Counsel, opposed Select's interpretation of its agreement with CL&P.  Just before trial and with the assistance of a FERC-appointed mediator, CL&P, Select, Duke, NRG, the Attorney General, the DPUC and the Consumer Counsel reached a settlement of the FERC Proceeding, which was submitted to FERC for approval on March 2, 2004.  Pl.'s Ex. 54; Def.'s Ex. 559.  The settlement, in which no party admitted liability, was approved by an order dated

---

[7]Although the invoice states it is for August, it is actually for September.

June 28, 2004, Pl.'s Ex. 55, and Constellation was aware of the settlement before it was approved. Select did not consult with Constellation before agreeing to the settlement. Pursuant to the settlement, Select received $40,361,746.03 from the escrowed funds, or about 42% of the amount it had sought in the litigation. Duke received $4,065,317.36, and NRG received $38,356,936.61. Pl.'s Ex. 54, App. A.

This action was filed in June 2004. Complaint [doc. # 1]. While this litigation was pending, Constellation issued a Statement of Account to Select on May 24, 2005, reflecting a revised calculation of LMP Differential Amount that Constellation claimed Select owed it. This revised calculation was prepared by Navroz Gandhi of Constellation, and it totaled $15,179,592.32 (consisting of $8,972,802.02 for congestion; $5,964,190.35 for marginal losses; and $242,599.95 for RMR). Pl.'s Ex. 44; Declaration of Navroz Gandhi, at 5. The revised calculation was based upon hypothetical delivery points – that is, points that Constellation never chose during the term of the Letter Agreement. Also, as Mr. Gandhi acknowledged at trial, he sought to maximize the LMP Differential Amount owed Constellation by selecting the lowest node on the NEPOOL PTF as a delivery point for each hour, thus creating as large a differential as possible. Finally, the delivery points chosen by Constellation for its post-litigation invoices do not conform to the delivery point methodology set forth in the Select/CL&P Letter Agreement.

## II.

### A.

"A federal court sitting in diversity applies the choice-of-law rules of the forum state." *Md. Cas. Co. v. Cont'l Cas. Co.*, 332 F.3d 145, 151 (2d Cir. 2003) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Connecticut law gives effect to a choice of law expressed in

a contract, except in limited circumstances. *Pokorne v. Gary*, 281 F. Supp. 2d 416, 419 (D. Conn. 2003) (citing *Elgar v. Elgar*, 679 A.2d 937, 943 (Conn. 1996) (listing circumstances in which a choice of law clause would not be operative)).  Here, the Master Agreement provides that New York law governs the parties' contract.  Pl.'s Ex. 2.[8]

The parties agree upon a number of principles governing the interpretation of contracts under New York law, principles that are no different under Connecticut law.  *See* Joint Stip. of Fact and Law [doc. # 103] Ex. A.   First, contracts must be construed and enforced as written.  *Anthony v. Syracuse Univ.*, 231 N.Y.S. 435, 439 (App. Div. 1928); *see also Travelers Indem. Co. v. 28 E. 70th St. Constr. Co.*, 296 F. Supp. 2d 476, 481 (S.D.N.Y. 2003) (applying New York law).   A court will not rewrite the contract for the parties or relieve a sophisticated contracting party from terms that it later deems disadvantageous.  *John Doris, Inc. v. Solomon R. Guggenheim Found.*, 618 N.Y.S.2d 99, 100 (App. Div. 1994).

Second, "[t]he best evidence of what parties to a written agreement intend is what they say in their writing."  *Slamow v. Delcol*, 584 N.Y.S.2d 424 (App. Div. 1992); *see also Civil Serv. Employees Ass'n, Inc. v. Plainedge Union Free Sch. Dist.*, 786 N.Y.S.2d 59, 60 (App. Div. 2004); *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002).  It is a "basic principle of contract interpretation that the intention of the parties as it existed at the time the contract was executed . . . must control rather than any subsequent intention tailored to complement an individual's posture once an agreement has gone sour."  *Caruso v. Ward*, 539 N.Y.S.2d 313, 318

---

[8]  The Master Agreement provides as follows: "THIS AGREEMENT AND THE RIGHTS AND DUTIES OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED, ENFORCED AND PERFORMED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW." Pl.'s Ex. 2.

(App. Div. 1989) (internal quotations omitted and alteration in original).  As a consequence, when a contract is unambiguous, the court must effectuate its plain language.  *See e.g.*, *Seabury Constr. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 68 (2d Cir. 2002) (applying New York law).  "[C]ourts should adopt an interpretation of a contract which gives meaning to every provision of the contract, with no provision left without force and effect." *Loctite VSI, Inc. v. Chemfab N.Y., Inc.*, 701 N.Y.S.2d 723, 725 (App. Div. 2000).

Third, under New York law, the language in a contract "is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Random House, Inc. v. Rosetta Books, LLC*, 150 F. Supp. 2d 613, 618 (S.D.N.Y 2001) (internal quotation marks and citations omitted).

Three other principles relating to contract interpretation are covered in the parties' Master Agreement, which also governs the Letter Agreement.  While ordinarily, language in a contract is construed against the drafter, the Master Agreement states that "[t]he Agreement shall be considered for all purposes as prepared through the joint efforts of the parties and shall not be construed against one party or the other as a result of the preparation, substitution, submission or other event of negotiation, drafting or execution hereof."  Pl.'s Ex. 2.  The Master Agreement also includes an integration clause, making it and the Letter Agreement "the entire agreement between the Parties relating to the subject matter contemplated by" the agreements.  *Id.*  Finally, the Master Agreement provides that the "term 'including' when used in this Agreement shall be by way of example only and shall not be considered in any way to be in limitation."  *Id.*

**B.**

There are two main contractual questions in this case.  First, who, as between Select and Constellation, is responsible under the Letter Agreement for payment of congestion charges in the Pre-SMD period?  Second, is Constellation entitled under the Letter Agreement to receive a refund from Select for amounts attributable to the LMP Differential in the Post-SMD period?  The Court will address each issue in turn.

**1.        Pre-SMD Congestion Charges.**        It is undisputed that CL&P was billed for congestion charges in the Pre-SMD period, that Select was responsible under the Select/CL&P Agreement to reimburse CL&P for those charges, that CL&P billed Select for those charges, which Select paid, that Select billed Constellation for its share of those congestion charges, and that Constellation paid Select for ten of those invoices before ceasing all payments of Pre-SMD congestion charges to Select.

To determine who is responsible for those Pre-SMD congestion charges, the Court begins, where all contract cases must begin, with the language of the parties' Letter Agreement.  *See Travelers Indem. Co.*, 296 F. Supp. 2d at 481 (applying New York law).  As noted above, the Letter Agreement expressly provides that "[d]uring the Delivery Term, [Constellation], as the supplier to the Load Assets, will be responsible for all requirements and associated costs for the foregoing products, losses, uplift costs and *any congestion charges associated with the Load Assets and any other requirements, expenses or charges imposed by NEPOOL or by ISO-New England, or any successor thereto ('ISO-NE') . . . .*"  Pl.'s Ex. 3, at 2 (emphasis added).   On its face, this provision would appear to make Constellation responsible for "any congestion charges," which would include the Pre-SMD congestion charges in dispute.

27

However, Constellation says, "Not so fast."  Its argument to the contrary focuses, not on the words "any congestion charges" in the Letter Agreement, but rather on the words "associated with the Load Assets," and the fact that the Letter Agreement was intended to be a Load Asset Contract. Constellation asserts (and Select agrees) that the only congestion charges imposed by NEPOOL and ISO New England during the Pre-SMD period were imposed under Section 24 of the NEPOOL Transmission Tariff.  From this established fact, Constellation then argues that Pre-SMD congestion charges were never "associated with the Load Assets," but rather were billed as a transmission charge and thus were "associated with transmission."  Thus, Constellation contends, there were no "congestion charges associated with the Load Assets" in the Pre-SMD period, and Constellation is not, therefore, responsible for any congestion charges for which Select reimbursed CL&P under the Select/CL&P Agreement. Hastening to add that its interpretation does not render the words "congestion charges associated with the Load Assets" meaningless,[9] Constellation contends that these words were inserted in the agreement to anticipate the change in billing that would occur with adoption of SMD, where congestion likely would be "associated with the Load Assets" and would no longer would be billed as a part of transmission service.  In sum, Constellation argues, under the plain terms of the Letter Agreement, Constellation agreed to accept responsibility for congestion charges in the Post-SMD period, since they were expected to be, and ultimately were, associated with the Load Assets, but Constellation did not assume them in the Pre-SMD period since congestion charges were never associated with the Load Assets in that time period.

The Court will grant that Constellation's argument is clever.  But for several reasons, the

_____

[9] *See, e.g.*, *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible.").

Court rejects it both on the law and the facts.  First, this provision of the Letter Agreement uses the broadest terms possible to describe Constellation's obligations.   Thus, it refers to *any* congestion charges, and *any other* requirements, expenses or *charges* imposed by NEPOOL or by ISO-New England.  The word "any" variously means "without specification or identification," "whatever and whichever it may be," "in whatever quantity or number," "every; all."  Random House Webster's Unabridged Dictionary (2d ed. 2001).  It is not a word of limitation, but is an all-encompassing term, and sophisticated contracting parties know that.  *See N. River Ins. Co. v. Allstate Ins. Co.*, 866 F. Supp. 123, 127 (S.D.N.Y. 1994) (finding in the context of an arbitration clause within a reinsurance contract that "[t]he use of the term 'any' makes it clear that the parties intended the clause to be broad").  Therefore, if the parties did not actually mean "every" and "all" but instead meant "none at all" in whatever period of time existed before NEPOOL adopted SMD, they surely would have said so.  Indeed, it is important to recall that Constellation knew that CL&P had shifted responsibility for Pre-SMD congestion charges to Select, because Constellation had seen the Select/CL&P Agreement before executing the Letter Agreement.  Faced with a contract that used such broad language as "any congestion charges," if Constellation truly had no intention of being responsible for congestion charges that it knew for a fact Select had agreed to pay CL&P, the Court would expect a sophisticated party like Constellation to have made such an intent clear in the contract.  That Constellation did not do so speaks volumes.

Second, the Letter Agreement on its face makes no distinction between charges in the Pre-SMD and Post-SMD periods, as Constellation contends it does.  It is certainly true that the parties were aware that at some point NEPOOL would adopt some form of SMD, and there are certain provisions of the Letter Agreement that appear to be designed to anticipate that eventuality.  *See,*

*e.g.*, Pl.'s Ex. 3, at 5 (referencing "load zones" in a provision on Delivery Point).   However, the Letter Agreement itself does not apply different rules to the Pre-SMD and Post-SMD time periods. To the contrary, the provision on congestion charges explicitly applies "[d]uring the Delivery Term," which includes the entire contract term, both what we now call the Pre-SMD period and the Post-SMD period.  Had the parties intended to apply different rules in these two periods, it would have been rather simple to say so explicitly.  It simply makes no sense that with millions of dollars at stake, sophisticated parties would choose to differentiate between Pre-SMD and Post-SMD congestion charges in the extremely subtle and ambiguous manner that Constellation suggests.

     Furthermore, as the Court made clear throughout the trial, Constellation's explanation that it willingly undertook to assume entirely unknown future congestion charges in the Post-SMD period, while simultaneously insisting that it would not shoulder the entirely known and quantifiable congestion charges in the Pre-SMD period makes absolutely no sense.  The Court asked several of Constellation's witnesses at trial why Constellation would willingly assume an unknown and unquantifiable risk – Post-SMD congestion – at the same time that it adamantly refused in the Letter Agreement to bear responsibility for a known and readily quantifiable risk – Pre-SMD congestion. None of the witnesses gave a satisfactory explanation.  For good reason – none exists.

     Third, Constellation's effort to limit the breadth of the phrase "any congestion charges" is wholly dependent upon the Court accepting its interpretation of the phrase "associated with Load Assets."  But Constellation acknowledges, as it must, that this phrase is not a term of art or a technical term in the industry.  Therefore, it must be construed in accordance with the ordinary meaning of the words used.  *See Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002) ("[I]f the court finds that the contract is not ambiguous it should assign the plain

and ordinary meaning to each term . . . ."). Once again, however, the words "associated with" are extremely broad; they are not words of limitation. The words "Load Assets" are defined terms. But the Letter Agreement defines "Load Assets" as "Standard Offer Load Asset," which in turn is defined as the responsibility for a percentage of the "retail customers of CL&P in CL&P's service territory that take Standard Offer Service." *See* Pl.'s Ex. 3, at 2. While it may be true that, in the Pre-SMD period, congestion charges were *billed* through the NEPOOL transmission tariff, the charges themselves were *associated with* serving retail load. Indeed, as Constellation's expert, Mr. Reed, points out, such charges arise because generation resources cannot physically be moved to the location of demand. Reed Report at 3. And the charges themselves are directly related to the energy demand of serving the Load Asset. Constellation's restrictive reading of the words "associated with" is not consistent with the ordinary meaning of those words.

It is true that Mr. Reed and others testified that ordinarily congestion charges were paid by the utility, in this case CL&P, as the utility usually provided for transmission under the NEPOOL Transmission Tariff. But all witnesses agreed that parties could shift congestion charges from the utility to others by means of a contract. Indeed, that is what WMECO did when it made Constellation responsible for congestion charges associated with serving WMECO's load. *See* note 2 *supra*. And that is precisely what CL&P did when it made Select responsible for Pre-SMD congestion charges in the Select/CL&P Agreement.[10]   Constellation knew about this switch in

---

[10] Constellation points out that Select did not use the same language in the Letter Agreement that was used in the Select/CL&P Agreement. In particular, there was no reference in the Letter Agreement to charges under the NEPOOL Transmission Tariff. But Select was certainly under no obligation to use the same language. In fact, the parties chose to utilize in the Letter Agreement much broader language to describe Constellation's responsibilities than was contained in the Select/CL&P Agreement.

responsibility at the time it negotiated the Letter Agreement. Yet Constellation took no steps to make clear in the Letter Agreement that by agreeing to pay "any congestion charges" associated with Load Assets, Constellation was somehow refusing to reimburse Select for the congestion charges associated with the portion of CL&P's load that Constellation would serve under the Letter Agreement. Constellation's failure to do so only confirms the Court's conclusion that this was not the parties' intent.

Fourth, it is apparent from the language and structure of the Letter Agreement that, for the portion of CL&P's load that Constellation was agreeing to provide, the parties intended to transfer from Select to Constellation *all* of the benefits and obligations that Select had assumed in its agreement with CL&P. This "back-to-back" nature of the parties' agreement is reflected throughout. Thus, the provision on "NEPOOL Contract Type," states in relevant part that "this Transaction . . . shall transfer from Select to [Constellation] responsibility and any corresponding benefit for" serving a portion of CL&P's retail customers that take Standard Offer Service during the term of the contract. Pl.'s Ex. 3, at 2. The next provision on "Product & ISO-NE Settlement Obligations" imposes on Constellation, "as supplier to the Load Assets," responsibility for "all requirements and associated costs . . . any congestion charges associated with the Load Assets and any other requirements, expenses or charges imposed by NEPOOL or by ISO New England." *Id.* The provision goes on to state, however, that in no event would Constellation be "required to pay any . . . charges and expenses that are not paid by Select to CL&P under the Select[/CL&P] Agreement." *Id.* The provision on "Losses" makes Constellation "responsible for its percentage share of all transmission and distribution losses associated with the delivery of electricity . . . to the meters of ultimate customers of CL&P receiving Standard Offer Service," and another provision imposes on

Constellation responsibility for its pro rata share of congestion costs "if CL&P or Select incurs congestion costs from the Delivery Point to the point of interconnection between CL&P's System and the NEPOOL PTF." *See id.* The price to Select from Constellation is expressly made inclusive of "any and all costs." And finally, and importantly, Select is compensated at a flat rate of only $.50 per MWh for transferring to Constellation the benefits of its contract with CL&P. It is apparent from the Letter Agreement itself that Select accepted such modest compensation because it had shifted to Constellation all of the risks attendant to serving CL&P's load.

Fifth, even if the Court were wrong in its interpretation of the express reference to congestion charges in the Letter Agreement, the provision in question goes on to make Constellation responsible for "any *other* . . . charges imposed by NEPOOL or by ISO-New England, or any successor thereto." Pl.'s Ex. 3, at 2. The Court cannot imagine a more broadly phrased catch-all provision. It literally covers the universe of charges, and there can be no question that Pre-SMD congestion costs were "charges imposed by NEPOOL or by ISO New England." Therefore, even if the express language governing congestion charges were insufficient in any way, the catch-all clause is sufficient in and of itself to impose Pre-SMD congestion charges on Constellation.[11]

As the foregoing discussion should make clear, the Court finds the Letter Agreement to be clear, unequivocal, and unambiguous. *See R/S Assoc. v. N.Y. Job Develop. Author.*, 771 N.E.2d 240, 242 (N.Y. 2002) (New York courts "have long adhered to the sound rule in the construction of

---

[11] It is true that CL&P and Select did pay certain NEPOOL and ISO New England charges so that, as Constellation argues, it is not literally true that Constellation paid *all* NEPOOL and ISO New England charges. But as Select argues, and the Court agrees, the default under the Letter Agreement was that Constellation paid *all* NEPOOL and ISO New England charges associated with serving its pro rata share of CL&P retail load unless another provision of the Letter Agreement or the parties' course of performance left those charges with CL&P or Select.

contracts, that where the language is clear, unequivocal and unambiguous, the contract is to be interpreted by its own language.").  Therefore, the Court's conclusions regarding responsibility for Pre-SMD congestion charges are based solely on the language of the Letter Agreement, as informed by the industry background within which the agreements were negotiated and executed.  *See* UCC § 1-303, Official Cmt. 1 ("[T]he meaning of the agreement of the parties is to be determined by the language used by them and by their action, read and interpreted in the light of commercial practices and other surrounding circumstances."); *Record Club of Am., Inc. v. United Artists Records, Inc.*, No. 72 CIV. 5234 (WCC), 1991 WL 73838, at * 8 (S.D.N.Y. Apr. 29, 1991) (applying New York law).

The Court has no need, therefore, to rely upon any pre-contract discussions between the parties or, as Constellation describes it, the parties' "secret intentions."[12]   A few words on those subjects are in order, however.  In support of its interpretation of the Letter Agreement, Constellation cites the testimony of Ms. Brown and Ms. Meyers that Mr. Haeflich sought to add to the contract clause in question the words "including any NEPOOL Transmission tariffs imposed" and that they told him that Constellation would not accept responsibility for Pre-SMD congestion charges.  In view of the integration clause in the contract and the clarity of the agreement itself, it would be improper to rely on these pre-contract statements.  *See RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003) ("Where a contract is clear and unambiguous on its face, the intent of

---

[12]  Select also relies on the fact that Constellation allegedly modeled pre-SMD congestion costs before entering into the Letter Agreement and in fact, reduced the price it was willing to pay Select because of that modeling, thus demonstrating that Constellation understood full well that it was responsible for Pre-SMD congestion costs.  *See* Def.'s Exs. 508-10.  Constellation disputes this version of the facts.  In view of the Court's ruling, the Court need not, and does not, resolve this hotly contested factual issue.  Furthermore, because of the Court's resolution of the Pre-SMD congestion cost issue, the Court need not address Select's request for an adverse inference based upon Constellation's alleged failure to preserve or produce documents concerning this modeling.

the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence.") (interpreting New York law) (internal quotations omitted).  However, even if the Court considered those alleged pre-contract statements, Constellation's refusal to add the words supposedly requested by Mr. Haeflich to the Letter Agreement is irrelevant.  The word "including" is defined in the Master Agreement as merely providing an example, and therefore the words purportedly sought by Mr. Haeflich would not have added anything to the obligations that Constellation had assumed under the words in the Letter Agreement.  As to the claim that the Constellation representatives told Mr. Haeflich that Constellation would not be responsible for Pre-SMD congestion, he disputes that claim, and the Court frankly finds the claim to be improbable, given the fact that such an important subject is not discussed in any writing and others at Select never heard of such a claim.  In any event, even if the alleged conversation did take place, even Constellation's witnesses admitted that Mr. Haeflich merely said that he was not sure he agreed with their interpretation of the deal.  That he never got back to them regarding the subject does not mean that Mr. Haeflich endorsed Constellation's interpretation of the parties' agreement.

Constellation also asserts that, under New York law, a court can never rely on one party's un-communicated subjective intentions in interpreting a contract.  *See* Motion in Limine To Exclude Evidence of Select's Secret Intent [doc. # 104].  Constellation is only partially correct.  The cases Constellation cites are outdated and/or not on point (i.e., dealing with intent to enter into a contract, rather than intent about a term within the contract).  In fact, one of the cases they cite, *Mencher v. Weiss*, 114 N.E.2d 177 (N.Y. 1953), specifically leaves open the availability of parol evidence on ambiguous terms, while finding no ambiguity in that case.  *Id.* at 181.  The better reading of New York law, and certainly the Second Circuit's interpretation of New York law on this point, is that

extrinsic evidence of subjective intent is admissible if a contract term is ambiguous.  *See Walk-In Med. Ctrs., Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir. 1987) (citing *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F. Supp. 987, 994 (S.D.N.Y. 1968)). In *Walk-In Medical Centers*, the Second Circuit stated as follows:

> At the trial of this action, [the district judge] admitted evidence of custom and usage in the securities industry, as well as evidence of the parties' intent, in order to interpret the phrase "adverse market conditions." Evidence of trade usage was properly admitted pursuant to New York Uniform Commercial Code § 2-202, which authorizes the use of such evidence to explain a contract term, whether or not the term has been found to be ambiguous. *See id.*, Official Comment 1(c). *Evidence of the parties' subjective intent was also properly admitted, in light of [the trial judge's] preliminary determination of ambiguity. See Paragon Resources, Inc. v. National Fuel Gas Distribution Corp.*, 695 F.2d 991, 996 (5th Cir. 1983) (applying New York law) (evidence of subjective intent is admissible only where court has determined that contract is ambiguous); *see also Surlak v. Surlak*, 95 A.D.2d 371, 375, 466 N.Y.S.2d 461, 466 (2d Dept. 1983).

818 F.2d at 264 (emphasis added); *see, e.g.*, *SR Int'l Bus. Ins. Co. v. World Trade Center Props., LLC*, No. 04-4500-cv(L), 2006 U.S. App. LEXIS 25879, at *44 (2d Cir. Oct. 18, 2006) ("At least with respect to a negotiated agreement, a party's subjective understanding, while not controlling, may shed light on the state of those negotiations and could bear on that party's objective actions.") *Curry Rd. v. K Mart Corp.*, 893 F.2d 509, 512 (2d Cir. 1990) ("Because an ambiguity is present in the relevant provisions of the lease, the parties are entitled to present extrinsic evidence of intent.") (deciding NY law). That said, because the Court concludes that the Letter Agreement is not ambiguous, the Court has no occasion to consider the respective subjective and un-communicated intentions of the parties.

Finally, in view of the Court's reliance on the clear language of the Letter Agreement, the

Court need not rely on the parties' post-contract course of performance. Nevertheless, if there were any doubt about the Letter Agreement's meaning, it is confirmed by Constellation's performance under the contract. *See* U.C.C. § 2-208, Official Cmt. 1 ("The parties themselves know best what they have meant by their words of agreement and their action under that agreement is the best indication of what that meaning was."). As stated previously, following execution of the Letter Agreement, Select billed Constellation for congestion charges, and Constellation paid ten invoices for congestion charges, totaling nearly $2.4 million over a period of sixteen months.

Constellation acknowledges that ordinarily evidence of post-contract performance would support Select's interpretation of the Letter Agreement. *See, e.g.*, *Stinnes Interoil Inc. v. Apex Oil Co.*, 604 F. Supp. 978, 982 (S.D.N.Y. 1985); *CT Chem (U.S.A.), Inc. v. Vinmar Impex. Inc.*, 613 N.E.2d 159, 162-63 (N.Y. 1993); *Gen. Elec. Capitol Commercial Auto. Fin., Inc. v. Spartan Motors*, *Ltd.*, 675 N.Y.S.2d 626, 633-34 (App. Div. 1998). However, Constellation asserts that it paid the Select bills by mistake. Constellation says that the individual who paid the invoices was told that Constellation was responsible for congestion charges under its agreement with WMECO and assumed, mistakenly, that Constellation had the identical agreement with Select, an entity related through Northeast Utilities to WMECO. *See* Egeberg Dep. at 53-54. If its payments were mistaken, Constellation argues, they cannot be used to support Select's contract interpretation. *See Kern Oil & Refining Co. v. Tenneco Oil Co.*, 792 F.2d 1380, 1386-87 (9th Cir. 1986).

However, Constellation did not shoulder its burden of establishing by a preponderance of the evidence that its substantial payments to Select over an extended period of time were a mere mistake. Mr Egeberg, who allegedly made this mistake, did not appear at trial. Mr. Egeberg no longer works for Constellation and is beyond the subpoena power of the Court, though that was true of other

37

Constellation witnesses.   In any event, because he never appeared at trial, the Court has no way to

evaluate Mr. Egeberg's demeanor.   Nevertheless, there are too many indications in the documentary

and testimonial record that other employees from Constellation, more senior than Mr. Egeberg, were

involved in these payments.  *See, e.g.*, Def.'s Exs. 515, 527, 528, 533, 536, 540;  Marlatt Dep. at 10-

29, 74-80; Brown Dep. at 37-38.[13]   Indeed, Mr. Egeberg was not even involved in the payment of

two invoices; Ms. Brown was, and Mr. Egeberg's superior, Mr. Marlatt (head of operations for

Constellation), approved the requests for payment of Select's congestion bills.  *See* Def.'s Ex. 536;

Egeberg Dep. at 119-121, 124; Marlatt Dep. at 81, 83, 95; Brown Dep. 34-46. As Mr. Egeberg

testified:

> Q.   So, again, just as Mr. Marlatt approved your processing invoices for congestion to Select apparently Mr. Marlatt did the same with Ms. Brown as evidenced by Exhibit 12, true?
>
> A.   (Objection overruled) That appears so.

Egeberg Dep. at 124.

Furthermore, it is difficult in the extreme for the Court to believe that Constellation paid such

large amounts over an extended period of time as a result of a mistake by a single member of the

clerical staff without upper management being aware of these payments.  *See* Marlatt Dep. at 74-80

(discussing procedures Constellation had in place to ensure invoices were only paid if amounts were

owed under a contract), 84-89 (testifying that Constellation would not make a payment of a

congestion invoice from Select without some type of approval).   In this regard, the Court notes that

---

[13]   An email from Andrew Kiss on June 2, 2000, after Select began invoicing Constellation for congestion charges states: "Congestion costs for WMCEO/CLP are still coming in high, and I am in the process of having NU validate their methodology for calculating these costs (not transparent) before we agree that we should pay them." Def.'s Ex. 527. Mr. Kiss acknowledged that he misspelled WMECO and that "CLP" stood for CL&P, though he insisted that when he wrote "WMCEO/CLP" he was referring only to WMECO.  *See* Kiss Dep. at 249, 253-56.

each of the invoices were plainly labeled as invoices for "congestion costs" from Select.  *See, e.g.*,

Def.'s Exs. 528, 530, 532, 533.   Notably, Mr. Marlatt testified as follows:

> Q.    So, with respect to that Exhibit 12 [evidencing a payment of congestion
>        charges to Select], do you recognize your signature?
> A.    Yes.
> Q.    And where is that on the document?
> A.    Approved by.
> Q.    Correct.  So you approved payment of these monies to Select Energy, is that
>        right?
> A.    I approved a wire to go out.
> . . . .
> Q.    *You're saying, when you signed that particular document, Exhibit 12, the
>        invoices [from Select for congestion charges] would have to be attached to
>        it, otherwise you wouldn't approve it, is that right*?
> A.    Yes.
> Q.    And you wouldn't approve it unless you had authorization from legal or
>        origination?
> A.    (Objection overruled) Some type of authorization from one of those groups.

Marlatt Dep. at 83-85 (emphasis added).  It also appears that Mr. Kiss from Constellation expressly

requested back-up data from Select for its congestion invoices.  Def.'s Exs. 530-32; 535; 538.

Thus, the Court concludes that Constellation has failed to carry its burden of showing that

its payments of Select's congestion billings were the result of a bona fide mistake.  Therefore, the

Court finds as a fact that Constellation's post-contract performance supports Select's interpretation

of the Letter Agreement.

In conclusion, the Court concludes that under the clear and unequivocal language of the

Letter Agreement, Constellation was responsible for Pre-SMD congestion charges.

**2.    The Post-SMD LMP Differential.**    The Court will now turn to the parties' dispute

regarding Post-SMD LMP.  As a preface, the Court summarizes several key undisputed facts relating

to this second issue: (1) Constellation paid LMP to ISO New England in the Post-SMD period for

its pro rata share of the CL&P load that it agreed to serve under the Letter Agreement; (2) it is Select's position, to this very day, that under the Select/CL&P Agreement, it was not responsible to CL&P for LMP in the Post-SMD period, though as an administrative accommodation to CL&P, Select agreed in the Select/CL&P Letter Agreement to pay the LMP in the first instance and then be reimbursed by CL&P for the LMP Differential Amount; (3) the CL&P/Select Agreement was never amended; (4) in the FERC Proceeding, Select sought to recover the LMP Differential Amount from CL&P in accordance with the Select/CL&P Letter Agreement, including LMP amounts attributable to the share of CL&P's load served by Constellation under the Letter Agreement; (5) Select's position regarding its interpretation of its agreements with CL&P was disputed in the FERC Proceeding and never finally determined; (6) Constellation did not participate in the FERC Proceeding and was urged by Select to do nothing regarding its claim that Select owed Constellation money for the LMP Differential until the FERC Proceeding was completed; and (7) Select received approximately $42 million as a settlement of its $97 million claim in the FERC Proceeding, none of which Select has shared with Constellation.

As was true with respect to Pre-SMD congestion charges, the Letter Agreement between Select and Constellation contains clear language that governs this dispute.   The provision labeled "Product & ISO-NE Settlement Obligations" states that Constellation will be responsible for, among other things, "congestion charges associated with the Load Assets and any other requirements, expenses or charges imposed by NEPOOL or by ISO-New England, or any successor thereto ('ISO-NE'); *provided, however, that [Constellation] shall not be required to pay any such ISO-NE or NEPOOL charges and expenses that are not paid by Select to CL&P pursuant to the Select Agreement.*"  Pl.'s Ex. 3, at 2-3 (emphasis added).   That provision goes on to state that Constellation

also "shall not be required to provide any products or services hereunder that are not products and services required to be provided by Select under the Select Agreement." *Id*.[14]

The words of the above-quoted proviso are clear and unambiguous. As Select's attorney conceded at oral argument, on its face, the proviso plainly states that Constellation is not required to pay any charge or expense that Select does not pay to CL&P under the Select/CL&P Agreement. The clear intent reflected in the words of the proviso – which was added by Constellation to the Letter Agreement, *see* Pl.'s Ex. 14, to mirror a similar provision that Select added to the Select/CL&P Agreement – is that Constellation would never be responsible for a charge, product, or service that Select was not required to pay or provide under its agreement with CL&P. That intent is as clearly expressed in the language and structure of the Letter Agreement as Constellation's responsibility for Pre-SMD congestion charges discussed above. *See also* Pl.'s Ex. 27 (Select document referring to the need for a legal sign-off that Constellation "pays what Select pays," followed by a question: "Inform [Constellation] about congestion refund?"). Constellation was responsible for any and all charges and expenses associated with serving Select's portion of CL&P's load but no charge or expense that Select did not also pay in serving that load. It follows, therefore, that under the unambiguous terms of the Letter Agreement, Constellation is not responsible for any LMP Differential that Select did not pay pursuant to the Select/CL&P Agreement.

Select makes a number of arguments in an effort to avoid the plain language of the Letter Agreement. Each is as unpersuasive as Constellation's arguments were regarding Pre-SMD

---

[14]  A clause entitled "Other Conditions" similarly states that the price of energy provided under the Letter Agreement is inclusive of all costs incurred by Constellation, "provided, however, that [Constellation] shall not be required to pay any such taxes, fees or levies that are not paid by Select pursuant to the Select[/CL&P] Agreement." Pl.'s Ex.3, at 8.

congestion charges.

First, Select asserts that what the proviso grants, latter provisions of the Letter Agreement take away.  Specifically, Select argues that the provisions labeled "Losses" and "Delivery Point & Congestion Rights" impose on Constellation the responsibility for paying its share of losses and congestion charges associated with the electricity provided to CL&P under the Letter Agreement. In particular, Select focuses on the language of the "Delivery Point & Congestion Rights" provision, which states that "if CL&P or Select incurs congestion costs from the Delivery Point to the point of interconnection between CL&P's System and the NEPOOL PTF system, or the load zone or zones in CL&P System in which the load is located, then [Constellation] is responsible for such congestion costs or its pro rata share of the congestion to such zones."  Pl.'s Ex. 3, at 5.  Select also argues that Constellation's course of performance confirms that it understood that it was responsible for LMP under the Letter Agreement.

There is no dispute that these portions of the Letter Agreement make Constellation responsible for LMP; indeed, Constellation readily acknowledges this, and accordingly, it paid the LMP it was billed by ISO New England during the Post-SMD period.  But this dispute is not about whether Constellation is responsible for LMP absent the proviso.  Rather, the dispute is about whether Constellation should have paid those amounts given Select's position that Select was not obligated to do so under the Select/CL&P Agreement.  There is nothing on the face of the language of the clauses quoted above that abrogates the clear language and intent of the proviso, which states that in no circumstances will Constellation ever be required to pay a charge that Select does not pay CL&P under the Select/CL&P Agreement.  Given the sweeping nature of the language of the proviso, if Select truly did intend to override the proviso in later provisions of the Letter Agreement,

the Court would have expected Select to have used more explicit language. *See Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, No. 04 Civ. 10014(PKL), 2005 WL 1950116, at *4 (S.D.N.Y. Aug. 12, 2005) ("Where unambiguous, courts are to interpret contractual language pursuant to its plain meaning, especially when dealing with sophisticated, counseled business people negotiating at arm's length.") (internal quotation marks omitted); *Am. Home Assurance Co. v. Merck & Co.*, 329 F. Supp. 2d 436, 444 (S.D.N.Y. 2004) ("As a general rule, the Court may not reinvent an obviously straightforward contract clause that was signed and executed by two sophisticated parties."). Select did not do so, and it cannot now escape the plain language of the proviso. *See Seabury Constr. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 68 (2d Cir. 2002) (applying New York law).[15]

Second, Select argues that the Letter Agreement is a Load Asset contract, while its agreement with CL&P is a Block Power contract and that this difference in the nature of the underlying contracts should make a difference in the handling of Post-SMD LMP. It is not at all clear to the Court that there are fundamental differences in the nature of the power obligations of the Letter Agreement and the Select/CL&P Agreement, both of which were registered with NEPOOL as Load Asset contracts and Load Asset Ownership shares. Def.'s Exs. 551; Ginnetti Dep., at 25-26. As both Mr. Sabbatino and Mr. Ginnetti agreed at trial, if the Letter Agreement transferred a load asset contract to Constellation, as Select says it did, then Select had to have a load asset contract with CL&P to transfer to Constellation.

In any event, even assuming that the differences that Select advances exist, they are irrelevant

---

[15]  Select's course of performance argument fails for a number of reasons, not the least of which is that Select never informed Constellation of the Select/CL&P Agreement, Select's position about its responsibility for Post-SMD LMP, or even the filing of the FERC Proceeding. Once Constellation discovered these matters, it promptly sought reimbursement for the LMP Differential.

for purposes of the proviso.  For the proviso is not founded on whether a contract is labeled Load

Asset or Block Power or how Select or Constellation provides power to CL&P's customers.  Instead,

the proviso broadly proclaims that in no event will Constellation be responsible for any charge,

product or services, that Select does not pay or provide to CL&P.  The language of the proviso is as

capacious as the language that precedes it – language, the Court might add, that Select relied upon

to impose pre-SMD congestion charges on Constellation.  In both instances, the language of the

Letter Agreement admits of no exceptions, and as was true with respect to Pre-SMD congestion

charges, the Court declines to read any exceptions into the proviso that the parties themselves did

not expressly include.

Third, Select asserts that even if Constellation paid LMP amounts that it was not required

to pay under the Letter Agreement (because Select itself was not required to pay them under the

Select/CL&P Agreement), no provision of the Letter Agreement allows Constellation to recover such

payments from Select.  The Court disagrees.   Several provisions of the Master Agreement, which

is expressly incorporated by reference in the Letter Agreement, allow Constellation to recover

amounts from Select that Constellation was not required to pay under the Letter Agreement.  For

one, the Master Agreement provides remedies for breach of contract in section 8.4.  *See* Pl.'s Ex. 2,

at 9.   At a minimum, by withholding amounts from Constellation that Select received via

reimbursement from CL&P, Select has breached the Letter Agreement, and Constellation is entitled

to recover its "direct actual damages" for that breach.[16]   In addition, section 4.3 provides a

---

[16]   Constellation included an equitable claim for unjust enrichment in its Complaint in the
event that the Court concluded that no provision of the Letter Agreement allowed for recovery of
Post-SMD LMP.  As Select points out, however, section 8.4 of the Master Agreement provides that
parties' liability under their agreement is limited to "direct actual damages" and that "all other
remedies or damages at law *or in equity* are waived."  Pl.'s Ex.2, at 9 (emphasis added).  As a result,

mechanism for parties to recover overpayments.

Fourth and finally, Select argues that Constellation's failure to intervene in the FERC Proceeding, where the issue of LMP Differential was litigated and eventually settled, bars Constellation from asserting a claim for recovery of amounts that Select received in the FERC Proceeding from CL&P.  The Court can easily dispose of this claim.  For it was Select that urged Constellation to sit tight and do nothing about its claim for LMP until the FERC Proceeding was completed.  Pl.'s Ex. 38.  It would be inequitable in the extreme to allow Select to benefit from its successful efforts to convince Constellation not to take any action regarding its LMP claim until the FERC Proceeding was completed.

Therefore, the Court finds that, in accordance with the Letter Agreement, Constellation is not responsible for any Post-SMD LMP that Select did not pay CL&P under the Select/CL&P Agreement.  The question then becomes, what amount is Constellation entitled to receive from Select as a result of this finding?  Constellation argues that, because it was entitled under the Letter Agreement to choose its Delivery Point, it should receive back from Select the highest LMP Differential that it can now calculate, regardless of what Delivery Points Constellation actually provided Select during the term of the Letter Agreement.  To that end, Constellation proffers a post-litigation "damage" claim prepared by Mr. Gandhi, which seeks recovery of $15,179,592.32, exclusive of interest.  Pl.'s Ex. 44.

The Court has little difficulty disposing of Mr. Gandhi's hypothetical musings about delivery points and LMP Differential. The proviso is expressly grounded in what was "not *paid* by Select to

---

Select argues that Constellation waived all equitable remedies.  In view of the fact that the Court concludes that Constellation is entitled to pursue its contract remedies to recover Post-SMD LMP, the Court has no need to address Select's waiver argument.

CL&P."  Pl.'s Ex. 2, at 3 (emphasis added).  Therefore, to the extent the proviso relieves Constellation of an obligation that it otherwise had under the Letter Agreement, the scope of that relief is limited to that which was "not paid by Select."  As such, Mr. Gandhi's post-litigation construct is entirely irrelevant under the terms of the Letter Agreement, as it is not based upon what was "not paid" by Select.  Indeed, Mr. Gandhi admitted that his litigation damage analysis did not even adhere to the limitations on delivery points that Select followed in its dealings with CL&P. Furthermore, section 8.4 of the Master Agreement expressly limits parties to recovery of "direct actual damages."  Pl.'s Ex. 2 at 9.  Since Mr. Gandhi's calculation is purely hypothetical and does not represent either the amounts not paid by Select or even the LMP amounts paid by Constellation, his calculation of damages is barred by the plain language of the parties' Letter Agreement.[17]

A more difficult question is whether Constellation is limited to recovering its pro rata share of the amounts Select received back from CL&P in the FERC Proceeding.  Constellation argues that it is entitled to recover its pro rata share of whatever amounts Select was not required to pay CL&P

---

[17]  There are many other defects in Mr. Gandhi's damage analysis, and there is no need to catalog them all.  Two additional examples should suffice to make the point.  For one, Mr. Gandhi admitted that he used Delivery Points for which Select had been provided no advance notice during the contract term, and that were, in fact, different from the Delivery Points that Constellation had provided Select during the term of the Letter Agreement.  Had Constellation provided Select with advance notice of the Delivery Points in Mr. Gandhi's analysis, Select could have taken appropriate hedging steps during the contract term. Put another way, the mere fact that Constellation had the right under the Letter Agreement to select Delivery Points does not mean that it can change those Delivery Points long after the contract has expired.  Furthermore, at the time Select settled with CL&P in the FERC Proceeding, Select had bills for the LMP Differential Amount from Constellation that are far different from the post-litigation amounts conjured up by Mr. Gandhi.  As Mr. Gandhi conceded, his creation does not merely correct errors in Constellation's prior bills to Select; he used an entirely different methodology to come up with much higher amounts owed, and he did so *after* Select had already settled with CL&P regarding the LMP Differential Amount.  Given these circumstances, the Court does not consider Mr. Gandhi's construct credible or permitted by the language of the Letter Agreement.

under the Select/CL&P Agreement, regardless of how the FERC Proceeding was resolved. The difference is substantial. If Constellation is limited to its share of the amounts Select recovered from CL&P in the FERC Proceeding, Constellation would be entitled to recover roughly 10% of $41 million, or about $4.1 million before interest. If, on the other hand, Constellation is entitled to recover from Select 10% of the full amount that Select claimed it was not obligated to pay CL&P under the Select/CL&P Agreement, Constellation would be entitled to recover from Select approximately $9.3 million before interest. *See* Pl.'s Ex. 45.

Relying on *Gulf Islands Leasing, Inc. v. Bombardier Capital Inc.*, No. 02 Civ. 2839 (WHP), 2006 WL 314523 (S.D.N.Y. Feb. 10, 2006), Constellation argues that the proviso relieves it of responsibility to pay any amounts that Select was not required to pay Constellation under the Select/CL&P Agreement, regardless of what Select agreed to in its settlement of the FERC Proceeding with CL&P. In *Gulf Islands Leasing*, the parties' contract stated that if one party, BCI, or its affiliate, "exercise[d] any purchase options pursuant to the relevant Purchase Documents," the other party, Gulf, would not have to pay a "Make Whole Fee" that would otherwise be assessed if Gulf caused their business relationship to end prematurely. BCI's associated entity had repurchased Gulf's interest in an airplane pursuant to a settlement agreement between the associated entity and Gulf, and BCI argued that Gulf was required to pay the "Make Whole Fee" because the repurchase was not the "exercise[ of] any purchase options pursuant to the relevant Purchase Documents." Gulf countered that the phrase "pursuant to the relevant Purchase Documents" was broad and included the repurchase pursuant to the comprehensive settlement the parties had entered into regarding their affairs. Citing Black's Law Dictionary, the Court stated that the term "pursuant to" meant "'in accordance with; under; as authorized by; or in carrying out.'" *Gulf Islands Leasing, Inc.*, 2006 WL

314523, at *4.  Because the repurchase was pursuant to the Settlement Agreement, and that agreement was not one of the enumerated purchase options within the contract, the Court held that the fee was due.  *See id.* at *5.

The Court does not find *Gulf Islands Leasing* particularly instructive in this case.  The express language of the proviso in the Letter Agreement is limited to any charges "paid by Select to CL&P pursuant to the Select[/CL&P] Agreement."  Pl.'s Ex. 3, at 3.  Constellation prefers to focus on the words "pursuant to the Select[/CL&P] Agreement."  But by focusing only on those words, Constellation reads out of the proviso the words "paid by Select to CL&P" and thus reads it as though it is limited to amounts that Select was *required to pay* to CL&P under the Select/CL&P Agreement.  The Letter Agreement certainly could have said that, but the proviso does not.  Instead, the proviso is focused on the amounts that actually are "paid by Select to CL&P" – not "payable" or "responsible for" or "required to pay," but "are paid."  Therefore, the amount that Select hypothetically was not required to pay CL&P pursuant to the Select/CL&P Agreement is not the relevant measure of damage.[18]

Here, we know that Select and Constellation did in fact pay certain amounts for LMP and that, as a result of the litigation before FERC, Select received certain monies back from CL&P as a refund of sorts on the LMP paid.  Constellation at oral argument asserted that the settlement between Select and CL&P was somehow a sham, but that last-minute claim is without substance.  Recall that Select's position in the FERC Proceeding was hotly contested by the Connecticut

---

[18]  For that reason, Constellation's arguments about how it is not bound by the settlement agreement are also not relevant.  The issue in this litigation is not what Select was or was not required to pay CL&P under the Select/CL&P Agreement, but rather what "was not paid by Select." We know what was "not paid"; it is the amount that Select got back from CL&P in the FERC Proceeding.

Attorney General, CL&P, and others and that the settlement applied to Duke and NRG as well as Select.  Certainly Duke and NRG had every reason to press as hard as possible for as much as possible from CL&P.  Moreover, the settlement was brokered under the auspices of the FERC, which found it to be a "reasonable resolution" of the issues.   Pl.'s Ex. 55, at 5.  Indeed, at a pre-hearing conference before an Administrative Law Judge in the FERC Proceeding, the judge had the following observation about Select's contractual  arguments: "I have read, as I say, the principal papers in this case and it is my belief that it is a very close case.  And I don't think either side has realistically better than a 50-50 chance."  Def.'s Ex. 609, at 29.

In those circumstances, there is no basis for this Court to find that the settlement is anything other than a good faith resolution of a bona fide contractual dispute.   For all intents and purposes, as a result of the settlement, certain amounts attributable to LMP were "not paid" by Select to CL&P. The settlement did not provide a breakdown of how the settlement amount was calculated.  However, since Select had included the LMP amounts attributable to Constellation in Select's claim against CL&P in the FERC Proceeding and since Select has not presented any evidence to show that the settlement amount was anything other than a percentage reduction in the overall amount sought by Select, the Court concludes that it is proper to award Constellation its pro rata portion of the amounts that Select received back from CL&P and thus were "not paid" by Select to CL&P.  Accordingly, the Court finds that Constellation is entitled to recover from Select its pro rata portion of the LMP Differential Amount that Select received from CL&P in connection with the settlement of the FERC Proceeding.

The Court and the parties agreed that in this opinion, the Court would rule only on liability. The Court's expectation is that the parties will now seek to agree on damages and pre-judgment

interest in accordance with the Court's decision and will make further submissions to the Court, preferably by stipulation, or if they continue to disagree, by supplemental briefing.[19] The Court will thereafter determine damages and enter a judgment accordingly. Each party asserts numerous special defenses.  To the extent the Court has not directly addressed each special defense above, they are rejected insofar as they are inconsistent with the Court's findings and rulings.  The parties have also filed numerous objections to the testimony, deposition and written, of each party's witnesses.  The Court also overrules any objection to testimony, written or otherwise, that is inconsistent with this ruling.  Finally, the Court rejects any special defense asserted by either party that is inconsistent with this ruling.

### III.

Before trial, the parties submitted a number of motions in limine.  The Court reserved ruling on them pending completion of the trial.   The Court now rules on the pending motions as follows:

1.  Plaintiff's Motion In Limine to Exclude Evidence of Select's Secret Intention [doc. # 104] is DENIED as moot for the reasons stated in this ruling;

2.  Plaintiff's Motion In Limine to Exclude Documents Not Produced in Discovery [#105] is DENIED as Moot because Defendant's Exhibit 580 was withdrawn.

3.  Plaintiff's Motion In Limine to Exclude Evidence Relating to Unclean Hands [doc.

---

[19] Select contends that during the SMD period, Constellation continued to gross up losses, even though losses were billed through the LMP in the Post-SMD period.  Select argues that the amount of these grossed-up losses totaled approximately $400,000.  *See* Def.'s Ex. 550; Declaration of James Ginnetti, at 6. Select also asserts that Constellation did not pay or credit Select with ARRs in the Post-SMD period. *Id.* at 7. The Court has made no determination in this opinion whether the grossed up losses, or value (if any) of ARRs, should be set off against any LMP Differential to which Constellation is entitled under this decision.  If the parties continue to disagree about that issue, they can submit the issue to the Court at the time they make their damage submissions.

# 106] is DENIED as moot because the Court did not credit any affirmative defense by Select regarding unclean hands.

4.    Plaintiff's Motion In Limine to Exclude "Expert" Testimony of Frank Sabbatino and James A. Ginnetti [doc. # 107] is DENIED as moot on the ground that Select did not tender the testimony of these witnesses as experts, and the Court has not considered their testimony as expert testimony.  To the extent that either of these witnesses have offered testimony beyond fact testimony, the Court has ignored it.

5.    Plaintiff's Motion In Limine to Exclude Testimony of James A. Ginnetti is DENIED as moot for the reasons stated in paragraphs 1 and 4 above.

6.    Plaintiff's Motion In Limine to Exclude Designated Deposition Testimony of Eugene Egeberg and John Reed [doc. # 109] is DENIED as moot.  Mr. Reed testified, and the parties agreed to submit designations of Mr. Egeberg's deposition testimony.

7.    Plaintiff's Motion In Limine to Exclude Designated Opinion Testimony of Navroz Gandhi [doc. # 110] is DENIED as moot, since the Court did not rely on any opinion testimony of Mr. Gandhi.

8.    Motion In Limine to Exclude Evidence Regarding Constellation's Compliance With Discovery and Select's Request For An Adverse Inference [doc. # 111] is DENIED as moot in view of the fact that the Court need not, and does not, draw any adverse inferences against Constellation based on discovery compliance.

## IV.

In summary, on the issue of liability only, the Court rules as follows:

(1)    Judgment of liability shall enter in favor of Constellation and against Select on

Counts I and IV of Constellation's Complaint [doc. # 1] for Constellation's pro rata share of the LMP Differential that Select received from CL&P in connection with the settlement of the FERC Proceeding, plus pre-judgment interest as provided in the parties' agreement.

(2)     Judgment shall enter against Constellation and in favor of Select on Count II of Constellation's Complaint [doc. # 1].

(3)     Counts III and V of Constellation's Complaint [doc. # 1], which are pleaded in the alternative to Counts II and IV, are dismissed as moot in view of the Court's rulings on Counts II and IV.

(4)     Judgment of liability shall enter in favor of Select and against Constellation on the First Count of its Counterclaim [doc. # 12] for pre-SMD congestion charges, plus pre-judgment interest in accordance with the parties' agreement.

The parties are ordered to submit a stipulation or supplemental briefs on the issue of damages, including pre-judgment interest, no later than **December 13, 2006**.

IT IS SO ORDERED,

/s/ _____Mark R. Kravitz_____
United States District Judge

Dated at New Haven, Connecticut: **November 14, 2006**.

52